UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT CODY T.[1]

               Plaintiff,

      v.

ANDREW SAUL, COMMISSIONER
SOCIAL SECURITY,

               Defendants.

Case No. 3:20-cv-00310-AC

OPINION AND ORDER

_____

ACOSTA, Magistrate Judge:

      Plaintiff Robert Cody T. ("Plaintiff") filed this action under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner") who denied him social security disability

insurance benefits ("Benefits").  The court finds the ALJ provided clear and convincing reasons

_____

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of
the non-governmental party in this case.

for discounting Plaintiff's testimony and lay testimony with respect to Plaintiff's limitations, and that he properly weighed the medical evidence. Accordingly, the Commissioner's final decision is supported by substantial evidence in the record and is affirmed.[2]

### Procedural Background

On or about November 14, 2017, Plaintiff filed an application for Benefits alleging an onset date of May 10, 2017. The application was denied initially, on reconsideration, and by Administrative Law Judge Richard Geib (the "ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

### Factual Background[3]

Plaintiff is fifty-one years old. He graduated from high school, completed two years of college, and obtained training in radiographic technology science. His past relevant work experience includes x-ray technician. Plaintiff has not been involved in a successful work attempt since May 10, 2017. He alleges disability because of bipolar disorder, acute depressive disorder, and cognitive limitations. Plaintiff meets the insured status requirements entitling him to Benefits through December 31, 2022.

/ / / / /

/ / / / /

/ / / / /

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

[3] Plaintiff asserts the ALJ erred by improperly rejecting medical records, evidence, and testimony regarding symptoms and limitations relating to his mental health diagnoses, primarily a significant impairment in his ability to interact with others. Consequently, the court will concentrate its review on evidence relating primarily to this impairment.

I. Testimony

    *A. Plaintiff*

In the Function Report completed by Plaintiff on December 13, 2017 ("Report"), he indicated he is: "unable to function at a high enough and consistent enough level of efficiency. Unable to concentrate and maintain pace in completing tasks. Trouble interacting with others and use of appropriate social behaviors." (Tr. of Social Security Administrative R., ECF No. 14 ("Admin. R."), at 226.) Plaintiff reported having difficulties with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Admin. R. at 231.) He can pay attention for only ten minutes at a time and follow only one instruction at a time. (Admin. R. at 232.) Plaintiff stated he fails to read instructions in their entirety and then forgets important parts, does not get along with authority figures, and was fired from most of his jobs for his inability to get along with coworkers or inappropriate conversations. (Admin. R. at 232.) He does not handle stress or changes in routine well and is always in fear of being fired or reprimanded. (Admin. R. at 232.)

Plaintiff noted he has difficulty sleeping due to insomnia and erratic sleep patterns, and wakes anywhere between 4:00 a.m. to 11:00 a.m. (Admin. R. at 227.) Upon waking, he takes a shower and makes hot oatmeal for breakfast. (Admin. R. at 227.) On an average day, he will "listen to the news or music on the radio for a few hours, feed animals, household chores. Greet son from school at 2:45, wife home at 5 pm. Wife prepares dinner, I clean when they do homework, TV then bed or read if not able to sleep." (Admin. R. at 227.) He enjoys reading and raising houseplants, including bonsai, but never finishes books and the plants die because he forgets to care for them. (Admin. R. at 230.)

Plaintiff reported he has difficulty remembering to do certain things, needs daily reminders, and his wife double checks everything he does, but represented he has no problem maintaining his personal needs and grooming without any reminders, except when to take his medications and eat. (Admin. R. at 227-28.) Plaintiff cares for the animals but his wife is primarily responsible for the care of their son and his wife has total control of the family finances due to Plaintiff's "silly impulse" purchases. (Admin. R. at 227, 230.)

Plaintiff ventures outside daily, preferably with his wife and son, and visits familiar places, such as his father's house, friends, and local restaurants without anxiety, but has difficulty following directions to unfamiliar places and becomes frustrated with traffic resulting in road rage and anxiety issues. (Admin. R. at 228, 230.) He constantly argues with different family members and no longer socializes on Facebook due to too many arguments and misunderstandings. (Admin. R. at 230-31.)

At the December 18, 2018 hearing ("Hearing), Plaintiff testified he worked two or three days a week as an x-ray technician for Columbia Pain and Spine ("Columbia") through May 2017. (Admin. R. at 45-47.) He stated this was the first job he enjoyed, which made him paranoid he would be fired. (Admin. R. at 47.) After losing this job, he worked two or three days for UPS during the 2017 holiday season. (Admin. R. at 40-41.) He then "got tension sick" and felt "really, really horrible" but still "called in every day" in the hope of qualifying for a bonus. (Admin. R. at 41.)

Plaintiff testified he has one-to-two days of chronic vomiting every other week, particularly when he is stressed about doing something, such as participating in the Hearing or thinking about going back to work, which he treats with marijuana without much relief. (Admin. R. at 48, 54.)

He spends a lot of time fighting the thoughts in his head relating to his failures and wants to just lay on the couch, do nothing, and sleep. (Admin. R. at 48-49.) He testified he is unable to concentrate or sit in one place for more than five to ten minutes, does not read or watch television or movies, and is annoyed when the television is on in the background. (Admin. R. at 53-54.)

Plaintiff described mood swings, during which he has difficulty focusing, and generally leaves the house for a walk or for a drive with his wife to settle down. (Admin. R. at 49, 53.) He has difficulty handling stressful situations and gets paranoid when he thinks someone does not like him. (Admin. R. at 51-52.) Plaintiff drives as little as possible in the city to avoid issues with road rage and frustration with traffic, but enjoys driving in the country. (Admin. R. at 52.) He is quick to anger and has outbursts to the point of dysfunction because of his frustration, during which he tries to do focused mediation or get out of the house and help friends with odd jobs to get his mind on something else. (Admin. R. at 49-50.) His current medications provide some relief for his anger limiting it to "little bursts." (Admin. R. at 50.)

Plaintiff represented he had been stressed about finances and considered looking for work in a job that requires little interaction with the public or coworkers until his wife discouraged him with comments suggesting that if he takes another job, his "stress is going to go through the roof" and he "will be barfing all the time." (Admin. R. at 58.) Plaintiff later testified he was not sure he would be able to drive to a job every day, and that his moods, anger, and difficulty handling instructions and criticism would limit his ability to get along with coworkers and supervisors. (Admin. R. at 59-60.) He explained most of his difficulties maintaining a job are due to his personality and complaints from coworkers that he was too "abrupt" and "rude," he now has zero confidence, and any job "scares the hell out of me," even those that allow him to work alone.

(Admin. R. at 70-71, 76-78.) He assists his wife in selling antiques at the "Expo" once a year, holding occasional garage sales, and picking out items to be resold on eBay, but would not characterize these activities a "career." (Admin. R. at 55-56.)

*B. Plaintiff's Wife*

In a letter included in Plaintiff's disability report apparently filed in December 2017, Plaintiff's wife, Nancy Jo T. ("Nancy"), reported Plaintiff lost his job at OHSU in 2006, and was unsuccessful at his next fifteen jobs, due to his inability to "interact with others in a normal way," and she believed the "the stress of looking for, keeping and continually getting let go from work has played a major part in his decline" during the previous two years. (Admin. R. at 210.) She stated many medical professionals with whom Plaintiff worked recognized his difficulties maintaining concentration and cognitive difficulties, and commented Plaintiff was recently diagnosed with bipolar disorder. (Admin. R. at 210.) Nancy explained:

> Rob is unable to return to work, it is absolutely debilitating for him to think of returning to his field as he knows he is unable and it is unsafe at this point to perform the duties required. Rob is unable to live and function independently, he is unable to manage his medications, he is unable to manage money and bills, Rob struggles with time and perspective, Rob is unable to travel to and from familiar places without getting lost. Rob[']s disability does not allow him to function with daily activities or work.

(Admin. R. at 210.)

In a December 21, 2017 third-party function report, Nancy reported "Rob cannot concentrate well enough to complete tasks. Rob[']s manic and depressive states make him very unpredictable. Rob[']s erratic sleep patterns make schedules difficult." (Admin. R. at 234.) Nancy stated Plaintiff "pisses" someone off every couple of weeks but, with her assistance, can work it out and move on, and she will not allow Plaintiff to use Facebook due to daily problems. (Admin.

R. at 238.) She noted Plaintiff had difficulty with memory, concentration, understanding, completing tasks, following instructions, and getting along with others. (Admin. R. at 239.) Nancy explained she occasionally has difficulty getting Plaintiff's his attention, he can work on something for only ten to fifteen minutes, and he does not follow written or oral instructions, work with authorities or coworkers, or handle stress or changes in routine, very well. (Admin. R. at 239-30.)

Nancy represented Plaintiff "putters" and picks up at home while waiting for her and their son to get home, cares for the animals, and is a good companion for their son. (Admin. R. at 235.) Nancy manages the family finances because Plaintiff has always struggled with money and math. (Admin. R. at 237.) She allows Plaintiff to order something only a couple times a year but feels comfortable with him handling the cash she allots to him. (Admin. R. at 237.) Nancy noted Plaintiff enjoys music and houseplants but reported he let their houseplants die on two occasions in the last five years. (Admin. R. at 238.) He visits his father and friends weekly and, when in the mood, will eat meals out or go to a movie. (Admin. R. at 238.)

At the Hearing, Nancy testified Plaintiff had difficulty managing money, interacting with people, following directions, and being told what to do. (Admin. R. at 62.) She indicated he has small angry reactions to things daily and that once a week he will have a more intense "blowup" involving yelling, generally in response to Nancy requesting he do things a different way. (Admin R. at 62-63.) She witnessed Plaintiff gradually experience increasing difficulties performing his job as an x-ray technician and come home exhausted due to his effort to "keep things together." (Admin. R. at 63-64.) She acknowledged Plaintiff worked two days for UPS during the holidays as a driver's helper, but indicated he started vomiting and never returned. (Admin. R. at 64.) Nancy explained Plaintiff likes to keep busy "fiddling" with things, assists her selling things on

PAGE 7 - OPINION AND ORDER

eBay, and enjoys shopping garage sales and working with plants, primarily bonsai, which he has sold on occasion. (Admin. R. at 65-67.) She commented that Plaintiff has difficulty in large social settings, such as family gatherings of more than thirty members of Nancy's family, and he elects to not attend the event or leaves early. (Admin. R. at 68.)

### C. Plaintiff's Mother-in-Law

In a letter dated December 4, 2018, Plaintiff's mother-in-law, Carolee, reported Plaintiff always struggled with "some of the characteristics that I see now but to a far lesser degree in the early years." (Admin. R. at 266.) She described bouts of depression, paranoia, anger, and lack of self-confidence, all of which have "taken a toll on our family members." (Admin. R. at 266.) Carolee represented Plaintiff "seems to completely 'lose' it and will rant and rave," but "he seems to do best when he is at home without a lot of outside stimuli." (Admin. R. at 266.)

### D. Plaintiff's Manager

In a November 6, 2018 letter, Pam Blanchard, Plaintiff's manager at Columbia ("Blanchard"), explained Plaintiff worked for Columbia as a "three day per week X-tray tech" from July 28, 2015, through May 16, 2017. (Admin. R. at 268.) Blanchard praised Plaintiff's early work but noted "during the last months of his employment, we noticed [Plaintiff] had a hard time focusing on his job, grew impatient with other staff members at times, and appeared to be struggling with keeping up with his work." (Admin. R. at 268.) She discussed these issues with Plaintiff, observing he "could easily be overwhelmed by his obligations, which would cause him to freeze up rather than tackle a task." (Admin. R. at 268.) Blanchard described one instance where Plaintiff "became very irritated" when he lost his badge, speaking harshly to the head nurse in the presence of a patient, yelling at staff, and throwing things around the procedure room.

(Admin. R. at 268.)  Her attempts to reason with or calm Plaintiff were unsuccessful.  (Admin. R. at 268.)  Blanchard asked Plaintiff to leave the clinic at that time and subsequently informed Plaintiff he was terminated.  (Admin. R. at 269.)

## II.  Medical Evidence

### A.  Treating Physicians

#### 1.  Karen E. Inaba, M.S., P.M.H.N.P.

Plaintiff began treatment with Karen E. Inaba, M.S., P.M.H.N.P. ("Inaba") in early 2017. (Admin. R. at 462.)  Inaba eventually diagnosed Plaintiff with bipolar disorder, which she described to be "in partial remission" on more than one occasion, as well as attention-deficit hyperactivity disorder ("ADHD"), cannabis induced anxiety disorder, depressive disorder, and intermittent explosive disorder, and treated Plaintiff regularly from January 6, 2017, to August 18, 2017, for moderate manic or depressive episodes. [4]  (Admin. R. at 412-417.)  Inaba encouraged Plaintiff to decrease or stop cannabis and alcohol use and Plaintiff indicated he "notice[d] less depression and concentration difficulties with reducing cannabis."  (Admin. R. at 426-29.)

On May 17, 2017, Plaintiff reported he lost his job the previous day because "his mood swings were too great" and he "scares the customers."  (Admin. R. at 441.)  In July and August 2017, Plaintiff reported stable mood and great sleep with no bad mood swings, and represented he was still occasionally working on-call X-ray jobs.  (Admin. R. at 426-28.)  He also reported he was doing home repairs and yard work in June and July 2017, and "almost [felt] good enough to return to work in the fall."  (Admin. R. at 428.)  During a June 1, 2017 telephone call to discuss

---

[4] Dawn L. Edwards, Ph. D., provided psychotherapy in conjunction with Inaba's care and medication management.  (Admin. R. at 413-414, 430.)

medications, Plaintiff informed a nurse his mood was better, he had no racing thoughts or difficulty concentrating, felt more focused, and was sleeping well and able to deal with his minimal anxiety. (Admin. R. at 432-33.) Plaintiff failed to show up for an appointment with Inaba on October 16, 2017. (Admin. R. at 420.)

On January 30, 2018, Plaintiff again reported stable mood and great sleep but stated he had chronic anxiety triggered by working and social anxiety when he did not work. (Admin. R. at 499.) Inaba suggested Plaintiff transfer treatment to the Mental Health Clinic with the goal of managing his moods, coping with his bipolar illness, and limiting his self-deprecation. (Admin. R. at 500, 535.) Plaintiff agreed and did not seek further treatment from Inaba. (Admin. R. at 500.)

Inaba completed a mental impairment questionnaire on October 24, 2018, at the request of Plaintiff's counsel. (Admin. R. at 582-586.) Inaba failed to respond to questions about Plaintiff's treatment, response, medications, medication side effects, current mental status, and prognosis, consistently noting she had not seen Plaintiff since January 2018 and was unable to comment on his current mental impairments. (Admin. R. at 582.) She reported she had diagnosed Plaintiff with bipolar I disorder; major depressive disorder, recurrent; cannabis use disorder; substance-induced mood disorder; alcohol use disorder, reported in remission; ADHD combined type; intermittent explosive disorder; and relationship problems with spouse. (Admin. R. at 582.) She represented Plaintiff had issues with stress tolerance, particularly stress resulting from such work demands as completing tasks; interacting with and handling instructions and criticism from supervisors; remaining a work a full day; and getting to work regularly. (Admin. R. at 582

\ \ \ \ \

PAGE 10 - OPINION AND ORDER

Inaba indicated Plaintiff's signs and symptoms included impairment in impulse control; mood disturbance; substance dependence; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes; and easy distractibility. (Admin. R. at 583.) She believed Plaintiff retained unlimited, or very good, ability to remember work-like procedures; understand, remember and carry out very short and simple or detailed instructions; maintain attention for a two-hour segment; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; interact appropriately with the general public; maintain socially appropriate behavior; and respond appropriately to changes in routine work settings. (Admin. R. at 584.) Additionally, Inaba indicated Plaintiff had limited but satisfactory ability to maintain regular attendance and be punctual within customary, usual strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal stress. (Admin. R. at 584.) Finally, she opined Plaintiff's impairments or treatments would cause him to be absent from work more than two days per month. (Admin. R. at 585.)

2. Susan E. Hoffman M.S.N., P.M.H.N.P.

With his transfer to the Mental Health Clinic, Susan E. Hoffman M.S.N., P.M.H.N.P. ("Hoffman"), became Plaintiff's primary health care provider. (Admin. R. 582.) After the Mental Health Clinic attempted to contact Plaintiff numerous times by letter inviting him to enroll in a "Managing Your Moods Group," Hoffman met with Plaintiff for the first time on May 10, 2018.

(Admin. R. at 569-76.) Plaintiff reported he felt "pretty damn content," believed his current medications were working, and said that his daily cannabis use calmed him, stopped his "racing thoughts," and prevented him from getting "edgy." (Admin. R. at 569.) He explained that since his "melt-down" when he lost his job, he learned his limits and how to avoid stressful situations, calm himself when he gets angry or anxious, and disengage himself from stressful situations. (Admin. R. at 569.) He also stated he was taking a mood management course and found it helpful, but it appears from the record Plaintiff failed to attend the class on more than one occasion. (Admin. R. at 552, 556, 570.)

At their next meeting on August 28, 2018, Plaintiff reported to Hoffman he was "better overall," his medications were "doing what they are supposed to do: slow things down, improve function and improve sleep," and his rapid thoughts and mood swings had decreased. (Admin. R. at 544.) He continued to experience some paranoia and depressive mood swings, but the depression was not constant, and he limited his driving to avoid road rage. (Admin. R. at 544-45.) Plaintiff indicated he had frequent "trauma memories" and "completely lost control" six times the previous year, throwing things and breaking stuff. (Admin. R. at 544-45.) Hoffman described Plaintiff as "calm, euthymic, polite, cooperative" with normal movements and speech, and linear thoughts. (Admin. R. at 544-45.) Plaintiff requested a new provider on October 16, 2018. (Admin. R. at 608.)

### 3. Erick H. Turner, M.D.

On November 26, 2018, Plaintiff initiated treatment with Erick H. Turner, M.D. ("Dr. Turner"), who had treated Plaintiff briefly "for a few months in early 2013 after which he was lost to follow-up." (Admin. R. at 608-09, 657, 662, 673.) Plaintiff reported "mood swings and

cognitive issues . . . [that] have come around in the last couple of years." (Admin. R. at 672.) He indicated he is "assaulted by negative memories remembering interpersonal failures" shortly after waking and "[t]hese kind of thoughts prevent him from doing anything that require[s] much cognitive effort at all, so he copes by engaging in activities that require very little effort, such as cleaning the dishes." (Admin. R. at 672.) Plaintiff indicated he had lost over thirty jobs and "given up the idea of going back to work." (Admin. R. at 672.) He stated he no longer drives because he gets confused easily and then gets frustrated. (Admin. R. at 672.) He used Uber for a while but was "cut off" by the company after his "interpersonal problems and moodiness got in the way" and he "got very angry and abusive with an Uber driver." (Admin. R. at 672.) Plaintiff reported the "anxiety medication" prescribed by Inaba "was very helpful in allowing him to be able to go out to social events." (Admin. R. at 674.)

Dr. Turner described Plaintiff's eye contact to be initially evasive with later improvement to "fair to good" and his affect to be slightly irritable but within reasonable limits throughout the session. (Admin. R. at 676.) He opined a diagnosis was "unclear at this time;" identified anxiety disorder, chronic mood disorder, nausea, vomiting, and trichotillomania (hair-pulling disorder), as Plaintiff's active health problems needing management; expressed concern when Plaintiff and his wife "used terms 'bipolar' and 'manic episode' several times during[the] meeting, as if there was no question about this diagnosis;" and recommended they stick with "objectively demonstrable symptoms and avoid diagnostic labels." (Admin. R. at 662, 672, 676.) He added haloperidol to Plaintiff's medication regimen, and referred Plaintiff for psychological testing, with a focus on moodiness, impulse control, and interpersonal difficulties, as well as various classes for distress

tolerance, anger management, interpersonal effectiveness, and emotional regulations. (Admin. R. at 676-77.)

### B. Examining Physician

In December 2018, Brent E. Fuller, Ph.D. ("Dr. Fuller"), evaluated Plaintiff through RBANS (Repeatable Battery for the Assessment of Neuropsychological Symptoms), MMPI, and NAB Memory Module testing. (Admin. R. at 708.) Plaintiff "indicated that he was feeling much better" and Dr. Fuller noted Plaintiff was "chatty, shared his experience, was able to sit for testing, and was pleasant." (Admin. R. at 706.) Dr. Fuller summarized the various test results as follows:

#### 1. MMPI

"Overall, his profile suggests that he is often quite obsessively worried [about] the future, himself, and things around him. He has strong depressive features which are characterized by poor self-esteem, self-hatred and inability to work with others. He also has significant anger expression such that he harms his interpersonal relationships, friendships, and work interactions." (Admin. R. at 710.)

#### 2. RBANS

"The total score was in the BORDERLINE range indicating that his overall functioning contains some significant deficits. He functions at a lower level than his peers and that he may have problems with working, going to school and having normal relationships. The areas of spatial/constructional and memory contributed to the low score." (Admin. R. at 711.) Specifically, Plaintiff scored in the extremely low range in the ability "to perceive special relations and to reconstruct visual diagrams from memory;" borderline range in the "ability to remember information that was presented sometime prior;" low average range in the "ability to remember

information that was presented sometime prior" and "remember[] lists of words that were presented three times;" and average in the "ability to process language, produce speech, and name objects." (Admin. R. at 710-11.)

       3. NAB-Memory Module

"The score he obtained on this comprehensive memory evaluation was considered MILDLY IMPAIRED and corresponds to the 6th percentile of men of his age. The veteran has the most impairment in verbal learning including list learning and story memory. He had better scores in non-verbal learning (shapes). His most impaired area was in the practical daily living memory where committing addresses, medication instructions and other information was very difficult for him." (Admin. R. at 711.)

Dr. Fuller then found no evidence of bipolar disorder and diagnosed Plaintiff with: "Major Depression, Generalized Anxiety Disorder and Personality Features. The latter Cluster B features are characterized by problems with authority figures, rages, difficulty with interpersonal relationships (Antisocial); and poor self-concept, uncontrolled emotionality, impulsive (Borderline)." (Admin. R. at 711.) With respect to cognitive limitations, Dr. Fuller concluded:

> His cognitive profile is overall at the Borderline level of cognitive impairment. He has deficits across neuropsychological areas of memory, attention and spatial relations. The etiology of this is unknown at this time, but it is clear that a neurocognitive disorder exists that prevents him from being effective in work settings, home activities and personal concerns. Some of this deficit may cause his anger and frustration given that he cannot remember the information that he needs to function at an age-appropriate level.

(Admin. R. at 711-12.)

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

*C. Reviewing Physicians*

Sergiy Barsukov, Psy.D. ("Dr. Barsukov"), reviewed Plaintiff's medical records and on January 17, 2018, opined Plaintiff suffered from non-severe affective/mood disorders with secondary psychoactive substance dependence disorders. (Admin. R. at 81, 85.) Dr. Barsukov acknowledged Plaintiff's reported symptoms of limitations in understanding, memory, sustained concentration, and persistence, found these symptoms to be "partially consistent" with medical evidence, and reported mild limitations in Plaintiff's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (Admin. R. at 86-87.) Dr. Barsukov concluded Plaintiff's impairments do "not significantly limit physical or mental abilities to do basic work activities" and found Plaintiff not disabled. (Admin. R. at 86-87.)

Irmgard E. Friedburg, Ph. D. ("Dr. Friedburg"), another reviewing physician, generally agreed with Dr. Barsukov's diagnosis but considered Plaintiff's depressive, bipolar, or related disorder to be "severe" in a report dated March 9, 2018. (Admin. R. at 95.) Dr. Friedburg believed Plaintiff's reported symptoms were not consistent with medical evidence and found Plaintiff had no difficulty understanding, remembering, and applying information or adapting and managing himself. (Admin. R. at 95-96.) Dr. Friedburg considered Plaintiff moderately limited in his ability to interact with others but noted the absence of evidence on limitations in his ability to ask simple questions or request assistance; accept instruction and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; or maintain socially appropriate behavior and adhere to basic standards of neatness and

cleanliness. (Admin. R. at 98.) On March 16, 2018, Susan E. Moner, M.D. ("Dr. Moner"), affirmed the initial determination of Dr. Barsukov that Plaintiff is not disabled. (Admin. R. at 89.)

### III. Vocational Evidence

Jennifer A. Swatez, M.S., VE, impartial vocational expert ("Swatez"), appeared at the Hearing and classified Plaintiff's past relevant work of x-ray technologist as light work with an SVP skill level of seven. (Admin. R. at 69, 270.) The ALJ asked Swatez if a hypothetical individual of Plaintiff's age, education, and work experience able to perform work at all exertional levels but limited to simple, routine tasks with additional restrictions of no contact with the general public and only occasional superficial contact with coworkers and supervisors could perform Plaintiff's past work. (Admin. R. at 73.) Swatez testified such an individual would not be able to perform Plaintiff's past work as an x-ray technologist but could perform the jobs of auto feed scanner, cleaner II, and gardener/yard worker. (Admin. R. at 73-74.) When the ALJ further limited the hypothetical individual to someone who was off task twenty percent of the workday and absent two or more days a month, Swatez stated such individual would not be able to perform any jobs in the national economy. (Admin. R. at 74.) In response to a question from Plaintiff's counsel, Swatez testified the individual would be unemployable if they were "unable to respond appropriately to supervisors consistently when they did have contact, such that they were argumentative or volatile or walked off the job." (Admin. R. at 75.) Swatez also confirmed the listed jobs all required workers to maintain a standard work schedule, including a morning and afternoon break and a lunch break. (Admin. R. at 75.)

\\\\\

\\\\\

PAGE 17 - OPINION AND ORDER

IV. ALJ Decision

The ALJ found Plaintiff suffered from the severe impairments of "Depressive Disorder, Personality Disorder, and Neurocognitive Disorder" and non-severe impairments of "cannabis abuse and ischemic heart disease" and determined Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 10, 2017. (Admin. R. at 15-16.) While conceding Plaintiff's impairments limited his ability to perform basic work activities, the ALJ found such impairments did not meet or equal the severity of any listed impairment. (Admin. R. at 15-16.) As a result of his impairments, the ALJ considered Plaintiff capable of performing a full range of work at all exertional levels but limited to only simple, routine tasks, no contact with the general public, and only occasional, superficial contact with coworkers and supervisors. (Admin. R at 17.) The ALJ deemed Plaintiff incapable of performing his past relevant work as an x-ray technician but able to perform the jobs of auto detailer, cleaner II, and gardener/yard worker despite the identified non-exertional limitations. (Admin. R. at 26-27.) Consequently, he found Plaintiff not disabled from May 10, 2017, through the date of the March 4, 2019 decision. (Admin. R. at 27.)

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Admin. R. at 18.) The ALJ discounted Plaintiff's testimony on the limiting effects of his "debilitating symptoms" finding the "are not entirely consistent with the medical evidence." (Admin. R. at 22.) The ALJ explained Plaintiff's statements about the limiting effects of his symptoms were not supported by recent psychiatric examinations that "revealed normal

movements, normal speech, linear thought, no auditory/visual hallucinations, no overt delusions, and calm/euthymic/polite/cooperative affect." (Admin. R. at 22.) The ALJ also noted Plaintiff's conservative treatment, lack of hospitalization, and improvement with appropriate treatment were inconsistent with Plaintiff's description of his limitations. (Admin. R. at 22.) Finally, the ALJ relied on evidence of Plaintiff's ability to perform "some work" and his reported work activities in discounting Plaintiff's testimony concerning the severity of his symptoms. (Admin. R. at 23.)

The ALJ also discounted testimony offered by Plaintiff's spouse, mother-in-law, and manager on the limiting effects of Plaintiff's impairments and his current abilities. (Admin. R. at 25.) He found the testimony not entirely credible due to the witnesses' close relationship with Plaintiff and as inconsistent with the opinions, medical evidence, and objective evidence. (Admin. R. at 25.)

The ALJ concluded the medical opinions offered by the state agency consultants with respect to Plaintiff's mental impairments were persuasive based on the consultants' thorough review of the medical records; consistency with, and support from, such medical records; results of objective medical testing; and evidence Plaintiff's condition improved with treatment. (Admin. R. at 24-25.) He found Dr. Fuller's opinion "unpersuasive to the conclusion that the claimant is disabled and unable to work." (Admin. R. at 24.) The ALJ noted Dr. Fuller "appear[red] to overestimate the effects of claimant's severe impairments" and failed to provide "an adequate function-by-function analysis for the purposes of Social Security disability evaluation." (Admin. R. at 24.) The ALJ also determined Inaba's opinion was unpersuasive based on inconsistencies in her opinions, a lack of support in the medical record, and repeated statements "she is unable to comment on the claimant's current status." (Admin. R. at 24.) The ALJ considered Inaba's

opinion Plaintiff "would miss more than two days of work" contradictory to her conclusion Plaintiff "would have unlimited or very good mental abilities and aptitudes." (Admin R. at 24.) Moreover, the ALJ noted Inaba represented the "claimant would have limited, but satisfactory ability to maintain regular attendance and be punctual within customary, usual strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; get[] along with co-workers or peers without unduly distracting them or exhibit behavioral extremes; and deal[] with normal work stress." (Admin. R. at 24.)

*Standard of Review*

The Act provides for payment of Benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2019). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). An individual will be determined disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2) (A) (2019).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for Benefits. 20 C.F.R. § 404.1520 (2019); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). First, the Commissioner determines whether the claimant is

engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past. If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied. 20 C.F.R. § 404.1520(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy considering his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995). The claimant is entitled to Benefits only if he or she is not able to perform other work. 20 C.F.R. § 404.1520(f).

\ \ \ \ \

PAGE 21 - OPINION AND ORDER

When an individual seeks Benefits because of disability, judicial review of the Commissioner's decision is guided by the standards set forth in 42 U.S.C. § 405(g). The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins* v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1545(a)(3) (2019); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). The reviewing court must consider the entire record as a whole weighing both the evidence that supports and detracts from the Commissioner's conclusion and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d

1028, 1035 (9th Cir. 2007). However, a reviewing court may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

*Discussion*

Plaintiff asserts the ALJ erred by failing to properly weigh the medical opinions or assess lay testimony, provide clear and convincing reasons for rejecting Plaintiff's testimony, and include all limitations supported by the record in his residual functional capacity assessment. Plaintiff asks the court to enter an order reversing the Commissioner's final decision and remand the matter for an award of benefits or, alternatively, for additional evidence and findings. The Commissioner contends the ALJ properly considered the evidence in accordance with the terms of the Act and related regulations, and the decision should be affirmed.

I. Plaintiff's Testimony

Plaintiff argues the ALJ erred by failing to identify specific, clear, and convincing reasons supported by substantial evidence in the record to discount his subjective symptom testimony. To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (2019). The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting

the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony. *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2013); *Tommasetti*, 533 F.3d at 1039.

"Credibility determinations are the province of the ALJ" and the court may not "second-guess" the ALJ's determination if they have made specific findings that are supported by substantial evidence in the record. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). The overall credibility decision may be upheld even if not all of the ALJ's reasons for rejecting a claimant's testimony are upheld. *Batson*, 359 F.3d at 1197. An ALJ needs only one valid reason for rejecting a claimant's subjective testimony with respect to symptoms and resulting limitations. *See Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ's decision to discredit symptom testimony may be upheld where specific justification not upheld if ALJ provided other valid rationale).

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and did not identify any evidence to establish Plaintiff was malingering. (Admin. R. at 18.) Consequently, the ALJ was required to offer clear and convincing reasons for rejecting Plaintiff's testimony with respect to the limitations supported by objective evidence. To meet this standard, "[t]he ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints – '[g]eneral findings are

PAGE 24 - OPINION AND ORDER

insufficient.'" *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), (quoting *Reddick v. Chater*, 157 F.3d 715,722 (9th Cir. 1998)); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (*en banc.*) ("[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.")

The ALJ stated "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Admin. R. at 18). The Ninth Circuit has expressly held a boilerplate statement such as this, without more, "falls short of meeting the ALJ's responsibility to provide 'a discussion of the evidence' and 'the reason or reasons upon which' his adverse determination is based." *Treichler v. SSA*, 775 F.3d 1090, 1103 (9th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)); *Brown-Hunter*, 806 F.3d at 493 (ALJ's finding that limitations identified by claimant were less serious than alleged based on unspecified claimant testimony and a summary of medical evidence insufficient to meet clear and convincing standard). Here, however, the ALJ engaged in additional discussion of the evidence and reasons for discounting Plaintiff's testimony, specifically identifying inconsistent treatment records, conservative and successful treatment, and Plaintiff's reported activities of daily living, including some work activities, as additional grounds for discounting Plaintiff's testimony.

At the outset, the court notes Plaintiff testified the primary reason he is unable to maintain employment is his personality disorders and resulting inability to deal with supervisors, coworkers, or the public. Plaintiff argues the ALJ erred in finding Plaintiff unable to work due to his mental limitations and failing to accept, or adequately consider, Plaintiff's inability to work with others. However, the ALJ expressly acknowledged Plaintiff's difficulties with interpersonal relationships by limiting him to only occasional superficial contact with coworkers and supervisors and no contact with

PAGE 25 - OPINION AND ORDER

the general public in his residual functional capacity analysis.[5]   Consequently, the court is not convinced the ALJ rejected Plaintiff's testimony with respect to his personality disorder and resulting difficulty dealing with others.  However, to the extent the ALJ did reject Plaintiff's testimony on these issues, he provided at least one relevant and appropriate justification adequately supported by the record.

### A. Inconsistent with Reported Daily Activities

The ALJ found Plaintiff's description of his daily activities to be inconsistent with his testimony regarding his limitations.  An ALJ may use a claimant's daily activities to reject his subjective symptom testimony on either of two grounds: (1) if the reported activities contradict the claimant's other testimony; or (2) if the activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  The ALJ was justified in discrediting Plaintiff's subjective testimony as contradictory of limitations resulting from his mental impairments.

The ALJ found the record revealed Plaintiff retained the ability to care for his personal hygiene, prepare meals, do laundry, wash the dishes, care for the animals, shop, drive, use a computer, care for houseplants, read, snowboard, walk in a three level-home, and enjoy his yard and large pool.  (Admin. R. at 23.)  These activities related primarily to Plaintiff's ability to engage in physical work and do not provide a valid reason for rejecting Plaintiff's testimony with respect to his inability to interact with others.[6]   Consequently, to the extent these daily activities relate solely to Plaintiff's ability to engage in physical work, the ALJ improperly relied on them to discount Plaintiff's reported difficulties interacting with others.  However, the ALJ offered other

---

[5] Additionally, the ALJ accounted for Plaintiff's cognitive limitations by restricting him to simple, routine tasks.
[6] Plaintiff does not dispute he retains the ability to engage in a full range of work at all exertional levels.

activities described by Plaintiff which he found to be inconsistent with Plaintiff's representation he had difficulty working with coworkers, authority figures, or the general public. For example, Plaintiff's reported activity of shopping, which necessarily involves interaction with others, could be viewed as inconsistent with Plaintiff's reported inability to work due to his inability to properly engage with others. Moreover, the ALJ relied on Plaintiff's testimony regarding his participation in selling and/or buying things at the Expo, farmers' markets and garage sales, all of which necessarily involve some interaction with other vendors and the public, generally in a crowded, chaotic situation, in finding Plaintiff was not as limited as he suggested.

The ALJ specifically identified daily activities which he believed were inconsistent, at least to some degree, with Plaintiff's testimony regarding the limitations resulting from his mental impairments which he claims prevent him from working. While one could view Plaintiff's reports of his daily living activities as somewhat consistent with the limitations he describes, the evidence also supports a finding to the contrary. The ALJ is responsible for determining credibility and where evidence exists to support the ALJ's finding, the court may not substitute its own judgment or second guess the ALJ. The court finds the ALJ properly discounted Plaintiff's testimony on his inability interact with others as inconsistent with his description of his activities of daily living.

*B. Inconsistent with Medical Records*

The ALJ also discounted Plaintiff's testimony based, in part, on medical evidence he considered inconsistent with the claimed severity of Plaintiff's limitations. As explained above, the ALJ may engage in ordinary techniques of assessing a witness's credibility "such as weighing inconsistent statements regarding symptoms by the claimant." *Smolen,* 80 F.3d 1284. Thus, it is not legally impermissible to give a claimant's testimony reduced weight because that testimony contradicts the objective medical evidence in the record. *Id.* However, the ALJ may not "make a

negative credibility finding 'solely because' the claimant's symptom testimony 'is not substantiated affirmatively by objective medical evidence.'" *Stockwell v. Colvin,* No. 3:13–cv–01220–HZ, 2014 WL 6064446, at *3 (D. Or. Nov. 11, 2014).

The ALJ specifically noted "recent psychiatric examination revealed normal movements, normal speech, linear thought, no auditory/visual hallucinations, no overt delusions, and clam/euthymic/polite/cooperative affect." (Admin. R. at 22.) The ALJ's citations to the record do not entirely support his statement. For example, the ALJ cites to emergency department records that describe Plaintiff as "alert, anxious, ill-appearing" in addition to "cooperative" with an "appropriate mood and affect." (Admin. R. at 297-298 (1F/12-13).) Other identified records merely commented Plaintiff's "mood and affect were positive" or he was "alert, in not distress, not toxic." (Admin. R. at 452 (2F/59), 617 (6F/31).) Some do not reference Plaintiff's mental limitations at all. (Admin. R. at 421, 468 (2F/14, 55), 617 (6F/31).) Most of the observations found in the quoted description of Plaintiff's mental appearance/abilities were made by Hoffman in treatment notes memorializing her two interactions with Plaintiff. (Admin. R. at 545, 571 (4F/30,55).)

Plaintiff's ability to interact appropriately with a medical professional during a relatively short examination is not inherently inconsistent with Plaintiff's testimony he has difficulty dealing with others in an ongoing work setting. As a result, Plaintiff's testimony regarding the severity of his mental limitations is not inconsistent with the medical records and clinical findings cited by the ALJ. Consequently, the ALJ erred in relying on such medical evidence as a reason for discounting Plaintiff's testimony.

\ \ \ \ \

*C. Conservative Treatment*

The ALJ also discounted Plaintiff's testimony based on treatment he described as "conservative" primarily because 'the medical record revealed no evidence of hospitalizations or admissions." (Admin. R. at 22.) Evidence of conservative treatment "is sufficient to discount a claimant's testimony regarding the severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007).

The record reveals Plaintiff consistently sought treatment for his physical and mental symptoms, including some visits to the emergency room, which resulted in psychiatric counseling, medications, and classes. The absence of hospitalizations or other admissions does not mean Plaintiff did not seek appropriate treatment or that the treatment provided was unduly conservative. *Shelly A. O. v. Comm'r, Soc. Sec. Admin.*, No. 3:18-cv-02158-HZ, 2020 WL 3868504, at *7 (D. Or. July 8, 2020) (citations omitted) ("This district, however, has repeatedly found that, in the context of mental health, 'the "mere fact that a claimant has not been admitted to a hospital on an inpatient basis" does not mean that a claimant received conservative treatment.'"); *Tammy L. O. v. Comm'r, Soc. Sec. Admin.*, Case No. 3:17-cv-774-SI, 2018 WL 3090196, at *13 (D. Or. June 20, 2018) ("The Court refuses to find that the mere fact that a claimant has not been admitted to a hospital on an inpatient basis means that the claimant has received only 'conservative treatment.'"). Many individuals with mental impairments that affect their ability to interact with others are not hospitalized or admitted to a mental institution for intensive treatment. The ALJ erred in by relying on conservative treatment to discount Plaintiff's treatment.

\ \ \ \ \

\ \ \ \ \

*D. Improvement with Treatment*

Finally, the ALJ noted the "medical record revealed the claimant's condition improved with appropriate treatment" and identified Plaintiff's numerous reports of improvement through medication and counseling. (Admin. R. at. 22-23.) Plaintiff reported his treatment, primarily medication, eliminated or reduced problems with racing or negative thoughts, paranoia, unexpected mood swings, and anger, as well as improved his sleep and function. (Admin. R. at. 436, 452, 569.) He indicated his medications were "doing what they are supposed to be doing," and described himself to be "pretty damn content" and "feeling much better." (Admin. R. at. 544, 569, 706.) Evidence of medical treatment successfully relieving symptoms can undermine a claim of disability. *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. § 404.1520a(c)(1)). Plaintiff's reports of improvement are inconsistent with his symptom testimony indicating his condition had not improved, and maybe even worsened, since he was last employed. The ALJ did not err in discounting Plaintiff's testimony based on his reported improvement with treatment.

## II. Lay Witness Testimony

Plaintiff argues the ALJ erred in his assessment of statements from Nancy, Carolee, and Blanchard because he failed to "provide germane reasons, supported by the record, to justify finding their statements to be unpersuasive." (Pl.'s Opening Brief, ECF No. 15 (Pl.'s Brief"), at 17.) Lay-witness testimony regarding a claimant's symptoms is competent evidence the ALJ must consider unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The ALJ's reasons for rejecting lay-witness testimony must also be "specific." *Stout v. Comm'r, Soc. Sec.*

*Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). Germane reasons for discrediting a lay-witness's testimony include inconsistency with the medical evidence and testimony that "generally repeat[s]" the properly discredited testimony of a claimant. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). *See also Williams v. Astrue*, 493 F. App'x 866 (9th Cir. 2012). The ALJ is not required, however, "to discuss every witness's testimony on a[n] individualized, witness-by-witness basis. Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012). "Although the ALJ must consider evidence from nonmedical sources pursuant to § 404.1520c(d) of the amended regulations, the ALJ is 'not required to articulate how [he] consider[s] evidence from nonmedical sources' and he does not have to use the same criteria as required for medical sources. The amended regulations, however, do not eliminate the need for the ALJ to articulate his assessment of the lay-witness statements." *Tanya L. L. v. Comm'r of Soc. Sec.*, No. 3:20-CV-00078-BR, 2021 WL 981492, at *7 (D. Or. Mar. 16, 2021).

The ALJ provided the requisite justification to discount the lay-witness testimony. The ALJ expressly found the lay testimony to be inconsistent with, or not supported by, "the preponderance of the opinions and medical evidence in the case." (Admin. R. at 25.) This is an appropriate justification supported by the evidence. *Bayliss,* 427 F.3d at 1218 (It is appropriate to reject the testimony of a lay witness where it is inconsistent with medical evidence.) Furthermore, the ALJ questioned the lay witnesses' ability to be completely honest based on the natural tendency for family and friends to agree with and adopt limitations identified by the Plaintiff and noted the limitations described by the lay witnesses are inconsistent with other evidence in the record, which

suggests a greater level of functioning. The testimony offered by the lay witnesses on the limiting effect of Plaintiff's impairments are substantially similar to that Plaintiff provided. The court has found the ALJ did not err in discounting Plaintiff's testimony and those reasons apply equally to Nancy, Carolee, and Blanchard.

III. Medical Testimony

Plaintiff contends the "ALJ erred because he failed to properly weigh the medical opinions per the regulations and failed to provide the supported reasoning to discount the examining physician opinion." (Pl.'s Brief at 4.) He specifically complains that the ALJ found unpersuasive Dr. Fuller's "conclusion that Plaintiff was disabled and unable to work."[7] (Pl.'s Brief at 5.)

Plaintiff filed his application for Benefits on November 14, 2017. "For claims filed on or after March 27, 2017, Federal Regulation 20 C.F.R. 416.920c governs how an ALJ must evaluate medical opinion evidence." *Tyrone W. v. Saul*, No. 3:19-cv-01719-IM, 2020 WL 6363839, at * 6 (D. Or. Oct. 28, 2020) (citing *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168818, 82 Fed. Reg. 5844, at *5867-68 (Jan. 18, 2017)); *see also Linda F. v. Saul*, No. C20-5076-MAT, 2020 WL 6544628, at *2 (W.D. Wash. Nov. 6, 2020) ("Because plaintiff filed her applications after March 27, 2017, new regulations apply to the ALJ's evaluation of medical opinion evidence."). The new regulations provide the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources." *See* 20 C.F.R. § 404.1520c(a) (2020).

---

[7] Plaintiff does not challenge the ALJ's finding as unpersuasive Inaba's opinion Plaintiff's impairments would cause him to be absent from work more than two days per month. (Pl.'s Brief at 5 n.1.)

Instead, the Commissioner must consider all medical opinions and "evaluate the persuasiveness" of such opinions using the factors specified in the regulations. 20 C.F.R. § 404.1520c(b) (2020). Those factors include "supportability," "consistency," "relationship with the claimant," "specialization," and "other factors." 20 C.F.R. § 404.1520c(a). The factors of "supportability" and "consistency" are "the most important factors" in the evaluation process. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).

The regulations require ALJs to "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." 20 C.F.R. §§ 404.1520c(b). The ALJ is not required to explain how he or she considered the secondary factors unless he or she finds that two or more medical opinions about the same issue are equally well-supported and consistent with the record but not identical. 20 C.F.R. §§ 404.1520c(b)(3). The court must, however, continue to consider whether the ALJ's analysis has the support of substantial evidence. *See* 42 U.S.C. § 405(g); *see also Hammock*, 879 F.2d 498, 501 (9th Cir. 1989).

The ALJ found Dr. Fuller's opinion "unpersuasive to the conclusion that the claimant is disabled and unable to work" because Dr. Fuller failed to provide a function-by-function analysis relevant to disability evaluation and overestimated Plaintiff's limitations based on Plaintiff's ability to perform some work. (Admin. R. at 24.) Dr. Fuller did not expressly conclude Plaintiff was disabled but did believe "a neurocognitive disorder exists that prevents [Plaintiff] from being effective in work settings, home activities and personal concerns." (Admin. R. at 711-12.)

Dr. Fuller's broad statement that Plaintiff's disorder prevents him from being effective in work settings is too general to be persuasive. He does not identify which functional limitations

are problematic in a work setting or in which work settings Plaintiff would have difficulties. Dr. Fuller's testing revealed Plaintiff had poor inability to work with others and significant anger expression that limited his ability to have successful relationships. Based on the test results, Dr. Fuller described Plaintiff as antisocial, characterized by problems with authority figures and difficulties with interpersonal relationships. However, Dr. Fuller did not opine on Plaintiff's ability to perform in work settings with minimal interaction with coworkers and no interaction with the general public, nor did he identify the extent to which Plaintiff's antisocial behavior limited his ability to work when compared to other identified issues, such as memory, attention, and spatial relationships. Accordingly, Dr. Fuller's statement Plaintiff may not be effective in work settings is not adequately explained to the degree necessary to be helpful to the ALJ in determining disability.

Moreover, to the extent Dr. Fuller opined Plaintiff was disabled, he ventured beyond his expertise as a medical provider and into the expertise of the ALJ. The new rules expressly provide statements that a claimant is disabled or unable to work are reserved to the Commissioner and are "inherently neither valuable nor persuasive to the issue of whether you are disabled" under the Act. 20 C.F.R. § 404.1520b(c)(3) (2020). The ALJ properly rejected as unpersuasive Dr. Fuller's opinion of Plaintiff as "disabled" for the purposes of the Act. The absence of evidence from Dr. Fuller on the degree to which Plaintiff's mental impairments affect his ability to perform specific mental demands of work activities, such as responding appropriately to supervision, co-workers, or the public, limits the supportability and consistency of the remainder of his opinion.

Finally, the ALJ noted the limitations identified by Dr. Fuller are not consistent with other evidence in the record, particularly Plaintiff's reports of daily activity evidencing his willingness

and ability to interact with crowds and other vendors at the Expo, farmers' markets, and garage sales. Additionally, the limitations are contradicted by Inaba's conclusion Plaintiff retained "unlimited or very good" ability to accept instructions and respond appropriately to criticism from supervisors, work in coordination and get along with others, interact appropriately with the general public, and maintain socially appropriate behavior. The ALJ offered appropriate reasons for rejecting Dr. Fuller's opinion as unpersuasive which are supported by the record.

The ALJ's findings as persuasive the reviewing physician's opinions on Plaintiff's mental limitations are similarly appropriate and supported by the record. The reviewing physicians found Plaintiff only mildly to moderately limited in his ability to interact with others. These findings are supported by Inaba's conclusions and consistent with the medical record, take into account Plaintiff's consistent reports of improvement with treatment, and are consistent with evidence of Plaintiff's functional level. The court finds the ALJ properly weighed the medical evidence and did not err by finding Dr. Fuller's opinion unpersuasive or in relying on the reviewing physician's opinions.

## IV. Residual Functional Capacity

Plaintiff argues the ALJ improperly assessed his residual functional capacity and thus erred at step five. Plaintiff claims the ALJ should have acknowledged Plaintiff's significant impairment in his ability to interact with others and found him disabled in accordance with SSR 81-15. (Pl.'s Brief at 22.)

The "residual functional capacity is the most [a claimant] can still do despite [his] limitations," 20 C.F.R. § 404.1545(a)(1). The ALJ found Plaintiff capable of a full range of work at all exertional levels but limited Plaintiff to simple, routine tasks, no contact with the general

public, and only occasional superficial conduct with coworkers and supervisors. The ALJ expressly acknowledged Plaintiff's impairment in his ability to interact with others by prohibiting contact with the public and allowing only occasional, superficial conduct with coworkers.

Prior to determining Plaintiff's residual functional capacity, the ALJ properly discounted Plaintiff's testimony and rejected lay testimony describing the extent to which Plaintiff's mental impairments limited his ability to interact with others. Additionally, he provided appropriate justification for finding Dr. Fuller's opinion unpersuasive. The ALJ's residual functional capacity finding and hypothetical included limitations which the record supported and, consequently, was proper. Because he posed a hypothetical question to the vocational expert that incorporated a proper residual functional capacity assessment, the vocational expert's testimony is substantial evidence for the ALJ's step five finding, and that finding is affirmed.

<em>Conclusion</em>

The Commissioner's findings on Plaintiff's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner is AFFIRMED.

DATED this _28th_ day of June, 2021.

JOHN V. ACOSTA
United States Magistrate Judge